# IN THE UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF TEXAS

# HOUSTON DIVISION

| | | |
|---|---|---|
| Antonio Young (I, Me) | § § § § | United States Courts Southern District of Texas FILED *June 28, 2021* Nathan Ochsner, Clerk of Court |
| *Plantiff* | § § § | |
| v. | § § | CIVIL ACTION NO. |
| Baylor Scott and White Medical Center | § | **4:21cv2116** |
| Dr. Wade W, Swanson | § | |
| Jeff Tyler, P.A. | § | _____ |
| Dr. Matthew B, Curnette | § | |
| John Doe, Security Guard | § § | |
| *Defendant* | § § § § | JURY REQUESTED |

## **PLAINTIFFS' PRO Se ORIGINAL Complaint**

### **JURISDICTION**

1. This Court has jurisdiction of this lawsuit under 28 U.S.C. §1331, which provides district courts with federal question jurisdiction over civil cases involving the United States Constitution, federal laws or treaties to which the United States

### **VENUE**

2. Venue is proper in this Court under 28 U.S.C. §1391(b), as the events occurred in Brazos county at Baylor Scott and White Medical Center located in College Station, TX. Baylor Scott and White is also the place of employment of the defendants listed above.

### **PARTIES**

3. Antonio Young filing Pro Se is the Plaintiff residing in Nacogdoches in Nacogdoches County, Texas.

4. Defendant Baylor Scott and White is location of violations in Brazos County

5. Defendant Dr. Wade W. Swanson was primary ER doctor employee of Baylor Scott and White

6. Defendant Jeff Tyler, P.A. was medical professional assigned to my case present during escorting from hospital.

7. Defendant Dr. Matthew B. Curnette is employee of Baylor Scott and White and doctor present during escorting

8. John Doe is Baylor Scott and White employee and security guard who escorted me out

9. I will amend the name of John Doe when his name is discovered

## CLAIMS

10. Defendants, Dr. Matthew Curnette, Jeff Tyler P.A., and John Doe, security guard kicked me from a hospital during a medical emergency while neither examining, treating or stabilizing me in direct violation of 42 USC 1395dd leading to worsening back injury, undergoing torturous symptoms in jail, and severe PTSD.

11. Defendant, Dr. Wade W Swanson then attempted to cover up the previous claim by falsifying medical records which among other things delayed my future treatment at another hospital

    A. Defendant lied about me being violent during visit though I was never verbally nor physically abusive.

    B. Defendant falsely claims that I could return to the hospital for treatment yet I was given a criminal trespassing warning preventing me from doing so

    C. Defendant made false claims of an examination that was never performed on me the entire time that I was at the hospital

    D. Defendant makes false claims of conversations both in my room and in the hallway where I was kicked out of the hospital however I didn't see the Dr.

    Swanson at all after my initial check into the room where they placed the O2 sensor and blood pressure cuff on me and went over some of the basics of my condition

E. Defendant claims that they tried to calm me and take me back to my room however I made multiple please to have Dr. Curnette or Jeff Tyler P.A. come to my room

F. Dr. Swanson claims that I knew that I had memory loss after taking Xanax and had intermittent memory loss for some time.

G. Dr. Swanson claimed that I threatened to call the cops or my attorney which never happened

H. Dr. Swanson falsely claimed that I declined my head CT and care which I did not, I asked for it to be delayed until a spoke to a doctor or nurse, because Dr. Swanson nor a nurse were in the room at the time.

I. The falsehoods continue throughout my medical records

## FACTS

12. On June 22, 2019 at about 8:15am, I, the Plaintiff, Antonio Young, a large black man, was taken to the Baylor Scott and White Medical Center in College Station, TX at 700 Scott and White Dr. via ambulance for what I would much later find out was a severe and dangerous reaction to a new prescription drug, Xanax, I had begun taking on June 19th.

13. I was experiencing memory loss, intermittent ringing in right ear, trouble reading and writing, numbness in my lower back and feet, rash, and several other cognitive and physical issues.

4

14. I explained some of these symptoms to my team of doctors and nurses as well as explained that I had been to College Station Medical Center twice in the previous two days for anxiety and other issues but hadn't been able to bring in my records like I wanted because my symptoms got worse and I had to call the ambulance
15. I was connected to an O2 sensor and blood pressure cuff and left in my room.
16. Later a lady would come by to get my consent to be treated and insurance, which I had recently loss. While attempting the signatures I noticed that I was struggling to read and write even more and thanked her for having the lines marked where I needed to sign.
17. As I set there a while longer I began to notice more and more issue with concentration, memory and some dizziness so I looked for a "call" button because I wasn't given one
18. I began to wave at nurses and people passing by in the hallway who worked for the hospital and call out for assistance as quietly as possible
19. I had several people acknowledge me and say "just a moment but none came in
20. Finally a young lady and gentleman came in to take me to get my CT scan but during my time sitting there I recalled some information that I felt may be important to my care.
21. I asked them if it was okay if I wait to have my scan done after I spoke to a doctor or nurse. I wanted to tell them my story from my previous days hospital visit.
22. Because of the number of people that had been there earlier I even commented that they could bring "everybody" and I wanted someone to write some information down for me in my notebook as I really struggled to write
23. They even asked me if I understood that I would be waiting until after other people and I said that was fine because I really needed to speak with a doctor or nurse,

24. I again was left by myself for some time with nobody coming in and attempted pulling off my O2 sensor and down my blook pressure cuff to make the equipment beep but no help came.
25. My phone going off with a call from my friend Nikki Anderson checking finally gave me the realization that I could remove the cuff completely and go from help.
26. I spoke with Nikki on the phone for a brief time explaining why I had called her and texted last night about my condition and what was going on
27. I had the phone on speaker as I was still have issues with the intermittent ringing and it was easier to hear this way as I walked to the doorway to get my bearings and see where the restroom and nurses stations were
28. Defendant, Dr. Matthew Curnette sat in a chair just in front of my room and to the lft of the nurses station as I looked out the door.
29. He instructed me to get back into my room for protection of patient information even though I hadn't left the room
30. I then told Nikki that I had to go and went to the bathroom a little down the hall to my left being glared at by Dr. Curnette like I was doing something wrong
31. I then went directly from the restroom to the nurses station where Dr. Curnette was now waiting behind the desk
32. He asked me what I needed and I let him know that I needed to speak with a doctor or nurse and had been trying to get one for a little while now but struggled to remember the name of the O2 and blood pressure cuff
33. Dr. Curnette develops an attitude and immediately gives me the ultimatum of going to my room and leaving the hospital

34. I couldn't understand why a medical professional was trying to kick me out of the hospital in my condition and continued talking trying to get help as my symptoms continued to manifest in talkativeness and agitation.

35. Dr. Curnette as one point stated that he was not a doctor on my case and introduced Jeff Tyler P.A,. who had come up during the conversation, though he introduced him as a nurse working on my case

36. I asked if he could come to my room and speak with me about my case and Dr. Curnette responded that "no he couldn't I would have to wait my turn"

37. I continued to try to plead my case or at least get an assurance of help, asking them repeatedly to follow me to my room

38. Defendant John Doe, security guard, showed up beside the two a little while later

39. Dr, Curnette came around the counter bumping me as they began to usher me out

40. I turned and walked back to my room as he aggressively asked to my back ?where I was going" and I came back saying "to get my stuff"

41. As they ushered me down the hallway I continually suggested that Dr. Curnette or Mr. Tyler check to see if my medical records had come in from College Station Med, while the other came to speak with me.

42. They seemed much more interested in getting rid of than helping even walking farther down the exit hallway than it would have taken to get to my room

43. At one point we were talking in front of a room and the nurse said that her patient had a headache so I tried to have them to follow me outside since we were moving that way

44. Dr. Curnette even went as far as to flip his id attached to his jacket over when he saw me staring at it trying to read it

45. He would agree to going outside with me and turn back with him and Mr. Tyler while John Doe continued to escort me out

46. At 9:34am, I would call 911 again from the outside as I had been just escorted out untreated for trying to get help with my worsening symptoms.

47. The police officers who came would speak with me and John Doe, the security guard before giving me a criminal trespass warning and escorting me still untreated to the edge of the property even though I had done nothing wrong

48. While there my symptoms would become even worse and I would become dizzy, lose the ability to stand and hyperventilate while calling 911 for the 3rd time

49. The EMTs would confirm that I was dehydrated but as I knew there was something else wrong since I had been dehydrated many times in my life

50. Fearing for my life and worsening condition I had them ambulance take me back up the driveway to the Scott and White since they were the closest and hadn't treated me in the first place on top of it meaning starting over at a new hospital

51. Upon us backing up to the hospital, me having my ability to walk again, they had me walk of the ambulance and I was immediately arrested by the same police who had abandoned me at the edge of the property

52. I would be taken to jail at Brazos County Detention Center where I was left to suffer the worsening side effects the 24 plus hours I was there while receiving no medical treatment

53. I feared for my life as I went through a roller coaster of symptoms including those listed above, struggling to breathe, manic, lost ability to urinate and more

54. I charged the door multiple times at one point as the officers were no longer letting me out
55. When I got out I no longer trusted a new ER, police or anyone I didn't know for help from what I had been through
56. I had to use a catheter to urinate when I made it home on the 24th
57. I began to have nightmares early the morning of the 24th as the PTSD had started but I didn't know if it was just PTSD or the continued symptoms.
58. I called my doctor to get help but the falsified records continued to delay it as they thought I didn't want to CT among other things
59. I continued to suffer through side effects as my throat would get a peppery feeling and I struggled to breathe
60. My friend, Brent Sowell's brother, Dr. David Sowell gave me the idea that it could be the Xanax.
61. On June 26th my doctor sent me to CHI St Joseph ER to have a CT done where they confirmed that I was having a reaction to Xanax
62. I continue to suffer the lower back as well as PTSD from these traumatic events

### DAMAGES/RELIEF

63. As a direct and proximate result of the acts and omissions outlined above, I have been severely damaged. Defendants' conduct caused physical pain, as well as emotional distress and mental anguish and trauma.

64. I seek compensatory damages in an amount deemed sufficient by the trier of fact to compensate them for their damages, which include physical pain, mental anguish, pain, and suffering.

65. I also seeks exemplary damages against Defendant.

66. For the all of the above damages, I am seeking $4,000,000

67. I also seek Attorney's fees should one be hired and court fees in addition to the above.

## JURY DEMAND

68. Plaintiff respectfully request a trial by jury.

## PRAYER

For these reasons, Plaintiffs seek judgment against Defendant for;

a.  compensatory and actual damages in an amount deemed sufficient by the trier of fact;

b.  exemplary damages;

c.  attorney's fees under 42 U.S.C. §1983 and §1988;

d.  costs of court;

e.  interest allowed by law for prejudgment and/or post-judgment interest.

Respectfully submitted,

/s/ Antonio Young

Antonio Young

323 E. Seale St

Nacogdoches, TX 75964

979-571-9955